IN THE UNITED STATES DISTRICT COURT
STATE OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| PLAINTIFF<br><br>　Patricia M. Posey,<br><br>　　vs.<br><br>DEFENDANTS<br><br>4 On The Way Express LLC and Audie R. Glisson, | Civil Action No. 3:23-4756-TLW<br><br><br><br>**COMPLAINT**<br>**JURY DEMAND** |

The Plaintiff, Patricia Posey ("Plaintiff") would respectfully show unto this Honorable Court the following:

**PARTIES, JURISDICTION, AND VENUE**

1.  Plaintiff is a citizens and resident of Lexington County, South Carolina.

2.  Upon information and belief, Defendant 4 On The Way Express LLC ("4 ON THE WAY EXPRESS") is a corporation organized under the laws of the State of Georgia, with its principal place of business in Sylvania, Georgia. 4 ON THE WAY EXPRESS is a commercial motor carrier bearing USDOT number 3294026 and at the time of the collision that is the subject of this litigation was authorized to transport goods and property in interstate commerce. Upon information and belief, the 4 ON THE WAY EXPRESS' member is a resident of the State of Georgia.

3. Upon information and belief, Defendant Audie R. Glisson ("GLISSON") is a resident of the State of Georgia and possesses a commercial driver's license issued by the State of South Carolina.

4. The wreck that is subject of this Complaint occurred in Lexington County, South Carolina on or around June 1, 2023.

5. The United States District Court for the District of South Carolina possess jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.00.

6. Venue is appropriate in the Columbia Division pursuant to 28 U.S.C. § 1391 and Local Civil Rule 3.01 DSC because a substantial part of the events or omissions give rise to the claim occurred within the Columbia Division of the District of South Carolina.

7. On June 1, 2023, the Defendant GLISSON was operating a commercial motor vehicle making a right turn from Main Street (referred to as "Pelion Road") onto Pine Street in Pelion, South Carolina.

8. Plaintiff was also attempting to make a right turn onto Pine Street.

9. The Defendant GLISSON was in the center lane and attempted to make a right turn onto Pine Street while Plaintiff was in the right turning lane.

10. The trailer Defendant GLISSON was operating and is owned by Defendant 4 ON THE WAY EXPRESS did not have proper working turn signals.

11.     Defendant GLISSON made a right hand turn from the center lane and collided with Plaintiff in the right turning lane.

12.     Defendant GLISSON's tractor trailer never came to a complete stop at the red light.

13.     Plaintiff Posey was in the right hand turning lane next to Defendant GLISSON.

14.     Defendant GLISSON crashed into Plaintiff Posey as he turned right at the light.

15.     Upon information and belief, Defendant GLISSON was turning from the center lane making a "right on red."

16.     As a result of the collision, Plaintiff suffered the following injuries and damages:

    (a)     Extensive pain, mental anguish, suffering and discomfort;

    (b)     Disability for a period of time;

    (c)     Money spent for medical care and treatment;

    (d)     Inability to carry on normal activities;

    (e)     Permanent injuries and disability;

    (f)     Emotion trauma and distress;

    (g)     Loss of enjoyment of life;

    (h)     Time and wages lost;

    (i)     Other damages to be proven at trial

## FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT GLISSON

17.     At all times relevant to this Complaint, Defendant GLISSON was operating a commercial motor vehicle transporting property in interstate commerce.

18. In order to undertake such actions, the Defendant GLISSON is required to have, at a minimum, the knowledge and skills necessary for the safe operation of the commercial motor vehicle.

19. The safe operation of commercial motor vehicles requires specialized knowledge and additional training not necessary for the safe operation of passenger vehicles because:

    (a) commercial motor vehicles are heavier than passenger vehicles and take longer to stop, as compared to a passenger car operating at the same pre braking speed;

    (b) commercial motor vehicles are heavier and longer than passenger vehicles and take longer to execute turning and lane change maneuvers, and take more room to enter traffic, as compared to passenger vehicles operating at the same pre-turn or lane change speed;

    (c) commercial motor vehicles are heavier than passenger vehicles and cause more significant property damage and/or personal injury or death in collisions, as compared to passenger cars operating at the same pre-collision speed and trajectory; and,

    (d) commercial motor vehicles pose more of a risk of causing personal injury, death, or property damage in a collision, as compared to a collision involving a passenger vehicle operating at the same-pre-collision speed and trajectory.

20. In order to undertake the safe operation of a commercial motor vehicle, drivers such as the Defendant GLISSON must have knowledge and skills in many areas, including the following:

    (a) the procedures for safe vehicle operations;

    (b) the proper procedures for performing basic maneuvers such as turning;

    (c) the importance of conducting a proper visual search;

    (d) the importance of proper visual search methods, including seeing ahead

    (e) and to the sides, and using mirrors;

4

   (f) the principles and procedures for proper communications and the hazards of failing to signal properly, failing to have property equipment to signal properly, including signaling intent and communicating presence;

   (g) the importance of understanding the effects of speed, including speed and visibility and speed and traffic flow; and

   (h) the procedures and techniques for controlling the space around the vehicle, including the importance of space management, space cushions, space to the sides, and space for traffic gaps.

21. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to make regular checks of their mirrors to be aware of traffic, including for vehicles on either side and to the rear.

22. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to be aware of the size and weight of their vehicles when entering traffic.

23. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that because of slow acceleration and the large space gap vehicles require, commercial vehicles need a much larger gap to enter traffic than in a passenger car.

24. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that acceleration varies with the load, and to allow more room if their vehicle is heavily loaded.

25. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that before they start to

cross or enter a road, to make sure the vehicle can get all the way across before traffic reaches the vehicle.

26.     The injuries and damages incurred by the Plaintiff Posey were directly and proximately caused by the Defendant GLISSON'S careless, negligent, grossly negligent, willful, wanton, reckless, and unlawful acts in one or more of the following particulars:

(a)     In failing to keep the turn signals of the vehicle/trailer and/or maintain them in proper working condition;

(b)     In failing to keep a proper look out for traffic and vehicles around him;

(c)     In making a right turn on red;

(d)     In failing to apply the brakes of the vehicle and/or maintain them in proper working condition;

(e)     In failing to steer or take other evasive action so as to avoid the collision;

(f)     In failing to keep a proper lookout;

(g)     In failing to yield as required by law;

(h)     In operating the vehicle too fast for existing conditions;

(i)     In failing to observe the condition of traffic;

(j)     In operating a commercial motor vehicle when he was not qualified to do so;

(k)     In failing to follow the proper procedures for safe commercial vehicle operations;

(l)     In failing to conduct a proper visual search which would have alerted the Defendant GLISSON to Plaintiff Posey presence, location, and intention;

(m)     In failing to properly communicate his intentions to enter Posey's path of travel;

(n)     In failing to account for his vehicle's speed and its effect of visibility and traffic flow;

(o)     In failing to properly control the space around his vehicle, including failing to maintain a proper space cushion, proper space to the sides, or proper space to allow for merging vehicles; and

(p)     In making a right hand turn from into the Plaintiff's path of travel..

27.     The Defendant GLISSON's careless, negligent, willful, wanton, reckless, and unlawful acts were the direct and proximate cause of the collision and resulting injuries and damages to Plaintiff Posey.

### FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT 4 ON THE WAY EXPRESS

28.     Plaintiff repeats and realleges paragraphs 1 – 27 as if verbatim.

29.     At all times relevant to the allegations contained in this Complaint, the Defendant GLISSON was working in the course and scope of his employment for Defendant 4 ON THE WAY EXPRESS or was otherwise acting as an agent or servant of the 4 ON THE WAY EXPRESS.

30.     The Defendant 4 ON THE WAY EXPRESS is liable for the acts and omissions of the Defendant GLISSON under the doctrines of respondeat superior, master/servant, and/or agent/principal.

31.     At all times relevant to this Complaint the Defendant GLISSON was operating a commercial motor vehicle in intrastate or interstate commerce under the USDOT authority granted to 4 ON THE WAY EXPRESS.

32.     Defendant 4 ON THE WAY EXPRESS is liable for the acts and omissions of Defendant GLISSON while he was operating under its authority by virtue of the Federal Motor Carrier Safety Regulations.

33. The Plaintiff is informed and believes that she is entitled to judgment against the Defendant 4 ON THE WAY EXPRESS for actual and punitive damages in an appropriate amount.

### FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANT 4 ON THE WAY EXPRESS

34. Plaintiff repeats and realleges as if verbatim paragraphs 1 – 33.

35. The Defendant 4 ON THE WAY EXPRESS operates as a commercial motor carrier.

36. In return for the privilege to operate commercial motor vehicles on the public roadways, prospective motor carriers must make certain safety related certifications and verifications.

37. Motor carriers such as Defendant 4 On THE WAY EXPRESS are required to submit a Form MCS-150 to the Federal Motor Carrier Administration and obtain an USDOT number.

38. Each Form MCS-150 4 ON THE WAY EXPRESS submitted or will submit contains a Certification Statement whereby 4 ON THE WAY EXPRESS declares under the penalty of perjury that is familiar with the Federal Motor Carrier Safety Regulations and/or Federal Hazardous Materials Regulations.

39. Motor Carriers such as Defendant 4 ON THE WAY EXPRESS are required to submit a Form OP-l to the Federal Motor Carrier Administration in order to gain interstate operating authority.

40. The Form OP-l submitted by Defendant 4 ON THE WAY EXPRESS contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that they are subject to the pertinent portions of the U.S. DOT's Federal Motor Carrier Safety Regulations ("FMCSR") at 49 CFR, Chapter 3, Subchapter B (Parts 350-399).

41. The Form OP-l submitted by Defendant 4 ON THE WAY EXPRESS contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that they have access to and are familiar with all applicable U.S. DOT regulations relating to the safe operation of commercial vehicles and that they will comply with the regulations.

42. Each Form OP-l submitted by Defendant 4 ON THE WAY EXPRESS contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that, at a minimum, they:.

> (a)  have in place a system and an individual responsible for ensuring overall compliance with the FMCSR;
>
> (b)  Can produce a copy of the FMCSR;
>
> (c)  Have in place a driver safety training/orientation program;
>
> (d)  are familiar with DOT regulations governing driver qualifications and have in place a system for overseeing driver qualification requirements (49 CFR Parts 391); and,
>
> (e)  have in place policies and procedures consistent with DOT regulations governing driving and operational safety of motor vehicles.

43. Reasonably safe motor carriers develop and implement policies, practices, and procedures to give effect to the minimum safety standards contained in the Federal Motor Carrier Safety Regulations to reduce or eliminate preventable collisions that may cause injury, death, or property damage on the public roadways.

44. Reasonably safe motor carriers train and educate their drivers regarding the safe operation of commercial motor vehicles.

45. Reasonably safe motor carriers utilize information and training materials from industry associations and third party safety vendors such as J.J. Keller & Associates, Inc., the "Smith System," Pro-Tread, and/or the National Safety Council to train and educate their drivers regarding the safe operation of commercial motor vehicles.

46. The safe operation of commercial motor vehicles includes practices and procedures related to speed management, space management, seeing ahead, total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness.

47. Reasonably safe motor carriers utilize publicly available government, industry, and trade publications regarding the preventability of highway collisions to design, develop, and implement safety management controls which are designed to reduce collisions involving commercial motor vehicles.

48. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver does not have the required knowledge or skill to safely operate the vehicle.

49. To be qualified to operate a commercial motor vehicle, a driver must have experience and/or training to safely operate the type of vehicle; must be physically qualified; must have a currently valid CDL and must furnish the motor carrier a list of current driving violations.

50. To operate a commercial motor vehicle under 4 ON THE WAY EXPRESS operating authority, the prospective driver is required to complete a written application containing the following information:

    (a) the nature and extent of the driver's experience;

    (b) a list of all accidents in the previous 3 years;

    (c) a list of all violations of motor vehicle laws in the previous 3 years;

    (d) a detailed description of any denial, revocation, or suspension of any drivers licenses or permits;

    (e) employment information for the previous 3 years; and,

    (f) the names of all employers for whom the driver has operated a commercial motor vehicle for the previous 7 years.

51. Before a motor carrier such as Defendant 4 ON THE WAY EXPRESS may allow or permit a driver to operate a commercial motor vehicle under its operating authority, the motor carrier must:

    (a) obtain the driver's motor vehicle record from the applicable state agency for the previous 3 years; and,

    (b) investigate the driver's safety performance history with all DOT regulated employers for the previous 3 years;

52. Once a motor carrier such as Defendant 4 ON THE WAY EXPRESS hires a commercial driver, every twelve months thereafter the driver must submit a written list of all traffic violations the driver received in those twelve months.

53. Motor carriers such as 4 ON THE WAY EXPRESS are required to maintain a Driver Qualification File meeting the requirements of 49 CFR § 391.51 for the duration of the driver's employment with the motor carrier plus three years.

54. In addition, drivers employed by, or operating under the authority of, motor carriers such as Defendant 4 ON THE WAY EXPRESS, are required to complete and turn in to their employer trip envelopes at least every 13 days. Such trip envelopes include, but are not limited to, the driver's daily Record of Duty Status logs and pre-trip and post-trip vehicle inspection reports.

55. Drivers' daily logs record how much time each driver spends on duty, on duty not driving, off duty, and in a sleeper birth. Driver logs also require drivers to indicate how many miles they drove during each 24 hour period and their locations at each change of duty status.

56. In addition to the required daily logs and vehicle inspection reports, it is standard in the industry for motor carriers also to collect information from their drivers, such as fuel receipts, entry and departure records, and other supporting documentation that verifies the times that their drivers were at specific locations.

57. In addition to the required daily logs, vehicle inspection reports, and supporting documentation, reasonably safe motor carriers utilize available technology such as GPS tracking systems and in cab communications systems to monitor the safety performance of their drivers.

58. It is standard in the industry for motor carriers to use the information contained in the required daily driver logs, vehicle inspection reports, and other supporting documents to audit the safety performance of their drivers.

59. It is also standard in the industry for motor carriers to use any additional information, such as in-cab communications and GPS tracking to audit the safety performance of their drivers.

60. It is standard in the industry for motor carriers to use the information contained in the required daily driver logs, vehicle inspection reports, and other supporting documentation to audit the safety performance of their drivers to ensure that their drivers are not violating hour of service rules, to ensure that their drivers do not average speeds in excess of what is safe, and. otherwise verify that the information contained in the driver's logs is accurate and truthful.

61. Auditing drivers' daily logs, vehicle inspection report, supporting documents, in cab communications, and GPS tracking information increases the likelihood that a motor carrier's drivers are operating their commercial vehicles safely and decreases the risk of a preventable crash.

62. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver is not qualified to do so.

63. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, in-cab communications, and GPS tracking information indicates that the driver has a higher than safe average speed.

64. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, in-cab communications, and GPS tracking information indicates that the driver operates his vehicle in violation of the hours of service rules.

65. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents,

in-cab communications, and GPS tracking information indicates that the driver is not accurate and truthful in the completion of his logs.

66. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver does not have the required knowledge or skill to safely operate the vehicle.

67. It is standard in the industry for careful motor carriers to regularly check their Safety Measurement System details.

68. The FMCSA's Safety Measurement System (SMS) provides an assessment of a motor carrier's on-road performance results within seven safety related categories. Motor carriers are scored on a percentile basis as compared to other similar carriers.

69. It is standard in the industry for motor carriers to regularly monitor their SMS scores and to address any areas of noncompliance before they lead to collisions.

70. The injuries and damages incurred by the Plaintiff Posey were directly and proximately caused by the Defendant 4 ON THE WAY EXPRESS' careless, negligent, grossly negligent, willful, wanton, reckless, and unlawful acts in one or more of the following particulars by failing to use reasonable care in the:

    (a) failing to design, develop, and implement adequate safety management controls related to speed management, space management, seeing ahead, total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness;

    (b) failing to train Defendant GLISSON regarding speed management, space management, seeing ahead, total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness;

   (c) failing to properly monitor and supervise the driving habits of Defendant GLISSON;

   (d) Supervision of its business operations in failing to properly monitor the driving habits and records of its drivers, employees, and/or agents, specifically the Defendant GLISSON;

   (e) Supervision of its drivers, employees, and/or agents, specifically the Defendant GLISSON;

   (f) Instruction of its drivers, employees, and/or agents, specifically the Defendant GLISSON;

   (g) Entrustment of a tractor trailer to its drivers, employees, and/or agents, specifically the Defendant GLISSON;

   (h) Compliance with federal and/or state regulations and industry standards, as referenced in this Complaint and as developed during the discovery in this case;

   (i) Improperly auditing the logs and supporting documentation of its drivers, employees, and/or agents, specifically the Defendant GLISSON;

   (j) Failing to utilize available information and technology to properly monitor its drivers, employees, and/or agents, specifically the Defendant GLISSON for compliance with company polices and/or state and federal regulations;

   (k) In allowing the Defendant GLISSON to operate a commercial motor vehicle despite knowledge of his inability to do so safely;

   (l) In failing to have adequate safety management controls in place to ensure compliance with the required safety fitness standard;

   (m) in failing to budget an appropriate amount of money to design, develop, and implement safety management controls in the areas of speed management, space management, seeing ahead total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness; and,

   (n) In failing to utilize available technology to monitor and audit the safety performance of its driver's including Defendant GLISSON.

  71. The Defendant 4 ON THE WAY EXPRESS' careless, negligent, willful, and wanton, reckless and unlawful acts were the direct and proximate cause of the collision resulting in injuries and damages to Plaintiff Posey.

**WHEREFORE**, the Plaintiff prays for judgment against the Defendants for actual, consequential, and punitive damages in an appropriate amount to be determined at trial in excess of $75,000.00, the cost of this action and for such other and further relief as the Court may deem just and proper.

Respectfully submitted

/s/ Chase Keibler_____
Chase C. Keibler, SC Fed Bar No.  12784
Keibler Law Group LLC
PO Box 2867
Irmo, SC 29063
T: +1.803.830.6242
F: +1.803.803.7264
Chase@KeiblerLaw.com
*Attorney for Plaintiff Posey*

September 22, 2023
Columbia, South Carolina